**Thomas A. O. GROSS,**
**Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,**
**Defendant.**

**Civ. A. No. 69–334–J.**

United States District Court,
D. Massachusetts.

Jan. 10, 1975.

As Amended Jan. 13, 1975.

---

Roger P. Stokey, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

D. D. Allegretti, Chicago, Ill., Warren E. Finken, Detroit, Mich., for defendant.

## OPINION

JULIAN, Senior District Judge.

Plaintiff claims that the defendant infringed his patent. He seeks injunctive relief and damages. Defendant denies infringement and also challenges the validity of the patent. In its counterclaim defendant prays for a declaratory judgment declaring plaintiff's patent not infringed, and invalid, and unenforceable, and for injunctive relief.

After trial on the merits the Court finds the following facts.

Plaintiff, Thomas A. O. Gross, is a citizen of the United States who resides in Lincoln, Massachusetts. He owns U. S. Patent No. 3,047,040, entitled "Pneumatic Load Bearing Devices," a copy of which is Exhibit 31 in this case. The defendant, General Motors Corporation, is a Delaware corporation having its principal place of business in Detroit, Michigan, and a regular and established place of business at 30 St. James Avenue, Boston, Massachusetts.

U. S. Patent No. 3,047,040 was issued to the plaintiff on July 31, 1962. Plaintiff's complaint as amended at trial (Tr. p. 3–95) alleges that defendant has infringed claims 1, 2 and 4 of his patent. The claims provide as follows:

"1. A pneumatic yieldable load bearing device comprising an enclosed container having wall portions movable and effective to vary the volume of the container, said portions supporting a load tending to move said portions, and a gas within said container, said gas being under a pressure effective to support said load and having a ratio of Cp/Cv of no more than about 1.25 and being uncondensible at temperatures and pressures

within the container encountered during normal operation of the device.

"2. A pneumatic yieldable load bearing device comprising an enclosed container having wall portions movable and effective to vary the volume of the container, said portions supporting a load tending to move said portions, and a gas having a ratio of Cp/Cv of no more than 1.25 within said container selected from the group consisting of $CClF_3$, $CH_3F$, $CF_4$, $C_2F_6$, $CHF_3$, $SF_6$, $BF_3$, $CBrF_3$, and $CCl_2F_2$, said gas being under a pressure effective to support said load and being uncondensible at temperatures and pressures within the container encountered during normal operation of the device.

\*    \*    \*    \*    \*    \*

"4. A pneumatic spring comprising a vesel [sic] having movable wall portions effective to vary the volume of the vessel and to support a load tending to move said portions, and an inflating medium within said vessel comprising a gas under a pressure effective to support said load and having a ratio of Cp/Cv of no more than 1.25 and being uncondensible at temperatures and pressures within the container encountered during normal operation of the device."

The ratio of Cp/Cv mentioned in the claims is symbolized by the Greek letter $\gamma$, gamma. In the ratio the letter "C" is a constant which represents specific heat, i. e., the heat necessary to change the temperature of a given quantity of gas a given number of degrees. The letter "p" is pressure and "v" is volume. Cp/Cv is the ratio of the specific heat of a gas under constant pressure to the specific heat of that gas at constant volume. Gases having a gamma of no more than 1.25 are hereinafter termed "low gamma gases"; those with a gamma above 1.25 are termed "high gamma gases." [1]

---

1. The terms "low" and "high" gamma are used in U. S. Patent No. 3,047,040. The plaintiff also spoke of "low" and "high" gamma gases during his testimony. These terms are not generally accepted scientific terms, they are plaintiff's terms. These terms were, however, used by counsel for both parties throughout the trial during questioning and the Court, therefore, uses them for convenience in this opinion.

The device alleged to infringe claims 1, 2 and 4 of the patent is a shock absorber marketed under the names "Pleasurizer" and "Pliacell." Appendix A to this opinion is a diagram of the device. The shock absorber is manufactured and sold by the defendant. Conventional shock absorbers, which were well known in the art, include an oil reservoir and a free gas space, usually filled with air, to accommodate displacement of the oil during stroking of the piston within the shock absorber. The accused device differs from conventional shock absorbers because it contains, instead of a free gas space, a nylon bag containing Freon-13 (trifluoromonochloromethane, $CCl_3F_3$), a low gamma gas.

Plaintiff did not invent pneumatic load bearing devices or pneumatic springs effective to support a load. Plaintiff neither discovered, defined nor formulated any law or property relating to any gas. Although plaintiff theorized that the use of a low gamma gas would lessen stiffness in a pneumatic device, he did not discover that stiffness is related to the gamma of the gas within the device. Nor did he invent any device which utilizes that natural property of a low gamma gas. The plaintiff testified and the Court finds that the relationship between stiffness and gamma is described in the prior art, Thompson, Mechanical Vibrations 81 (2d ed. 1951). In essence, however, plaintiff is attempting to monopolize load bearing devices or pneumatic springs which contain a low gamma gas and thereby utilize the principle that stiffness is related to the gamma of the gas in the device: "the invention may be embodied in pneumatic springs, tires, and similar devices by inflating them with a gas having a γ of less than 1.25 . . . . Conventional pneumatic load bearing systems designed for use with air may be used in this invention without structural modification, by removing the air and replacing it with the low gamma gas under the same static pressure." (Exh. 31, col. 2, lines 22–31.) Claims 1, 2 and 4 are so broad that their effect is to patent the relatively high compressibility of certain gases. The claims, if valid, would monopolize the purported benefits which flow from that natural physical property.[2]

On January 9, 1956 plaintiff filed an application, Serial No. 557,985, for a patent. The only drawing filed in this 1956 application, attached as Appendix B to this opinion, depicts a "vehicle including a body 10" and a pneumatic spring "closed at the top by a close fitting cover plate 24 which carries the body 10." "The cover plate 24 is supported by the pressure of the vapor of a liquid 26 . . . ." (Exh. J, "Application for United States Patent, Specification," at 8–9.) The 1956 application had nine claims. The claims of the 1956 application, particularly claims 1, 2, 4 and 6 thereof, are relevant to an understanding of claims 1, 2 and 4 of the patent at issue. Claims 1, 2, 4 and 6 were rejected because of prior art on September 21, 1956.

The Patent Office received an amendment on March 19, 1957. The claims were rejected because of the same prior art on December 20, 1957. A second

2. Plaintiff's Brief Pursuant to Order of October 11, 1974, at 8–9 (emphasis in original) states:

"If Gross had tried to patent *any* load-bearing device or shock absorber containing a low gamma gas his claim would have been similar to the Eighth Claim of Morse. It *would* have been too broad. Instead Gross described devices utilizing soft gases. His claims cover *those* devices with soft gases. They do not encompass *all* devices with soft gases."

During the trial the terms "low gamma gases" and "soft gases" were employed to denote the same gases. The plaintiff's statement, therefore, seems to concede overbreadth. The Court does not rely on this language, however, since plaintiff's meaning is less than clear, especially in light of plaintiff's insistence that claims 1, 2 and 4 are valid.

amendment was received by the Patent Office on May 29, 1958. On September 5, 1958 a final rejection of the claims issued. The Acting Examiner relied on the same prior art and also included the statement: "Applicant apparently uses the terms 'gases' and 'vapors' interchangeably. . . . A gas has a different thermodynamic characteristic than a vapor." On March 2, 1959 plaintiff appealed to the Board of Appeals.

The appeal was to be heard by the Board of Appeals on November 8, 1961. On May 12, 1960 plaintiff expressly abandoned his application. 37 C.F.R. § 1.138 (Revised as of Jan. 1, 1960).

On January 25, 1960[3] plaintiff filed the application which ultimately resulted in issuance of Patent No. 3,047,040. The application stated it was a continuation-in-part of the 1956 application.[4]

On May 5, 1960 all claims were rejected. The Acting Examiner wrote:

"It is the Examiner's position that the instant application is *not* a continuation-in-part of applicant's earlier application since the instant application does not add any new matter which has not already been disclosed in the earlier application.

"In the instant application, applicant has merely selected a group of gases which do not condense at the temperatures and pressures encountered in a vehicle suspension system.

"These same gases were disclosed in applicant's prior application, Serial No. 557,985, as being inherently gaseous under normal conditions in pneumatic load bearing devices.

&ast; &ast; &ast; &ast; &ast; &ast;

"Since the instant application is not considered to be a continuation-in-part of application Serial No. 557,985, claims 1, 2 and 4 are rejected as being unpatentable over Needy as applied in the Examiner's Answer in the rejection of claims 1 to 4 and 6 contained in applicant's application Serial No. 557,985."

(Exh. 2, pp. 14–15.)

On November 1, 1960 the Patent Office received an amendment. On February 9, 1961 all claims were rejected because of the same and additional prior art. On August 7, 1961 a second amendment was filed. In his "Remarks" which accompanied this amendment, plaintiff argued that the prior art dealt with liquids in containers while plaintiff's claims concerned gas which is "uncondensible under the conditions within said container." (Exh. 2, p. 23.) On January 18, 1962 the Examiner rejected all claims. As one reason for rejection he wrote:

"Claims 1–4 are rejected as indefinite as it is not understood what is meant by the phrase 'uncondensible under the conditions within said container'. If by this phrase the applicant means —at temperatures and pressures within the container encountered during normal operation of the device—, it is suggested that this phrase be substituted."

(Exh. 2, p. 29.)

---

3. Patent No. 3,047,040, col. 1, line 4, erroneously states the application was "Filed Jan. 25, 1950."

4. "A continuation-in-part is an application filed during the lifetime of an earlier application by the same applicant, repeating some substantial portion or all of the earlier application *and adding matter not disclosed* in the said earlier case." Manual of Patent Examining Procedure § 201.08 (U. S. Patent Office, 2d ed. November 1953, Revision 4, July 1958).
"A continuation is a second application for the same invention claimed in a prior application and filed before the original becomes abandoned. . . . The disclosure presented in the continuation must be the same as that of the original application, i. e., the continuation should not include anything which would constitute new matter if inserted in the original application.
"Where an application has been prosecuted to a final rejection an applicant may have recourse to filing a continuation in order to introduce into the case a new set of claims and to establish a right to further examination by the Primary Examiner." *Id.*, § 201.07.

On March 6, 1962 an amendment was filed. The amendment adopted the Examiner's suggestion and also clarified another ambiguity in one claim. A "Supplemental Amendment" was made on May 3, 1962. On May 25, 1962 the Principal Examiner corrected an "obvious informality" in the application and on May 31, 1962 a "Notice of Allowance" was mailed.

Patent No. 3,047,040 was granted to plaintiff on July 31, 1962, on an application Serial No. 4,314, filed January 25, 1960. The patent contains a reference to the earlier filed application of plaintiff, Serial No. 557,985, filed January 9, 1956, now abandoned, of which application Serial No. 4,314 is stated to be a continuation-in-part.

During the pendency of the 1956 application it was not disclosed, either expressly or by inference or implication, that the device contemplated by the plaintiff must include only gas which is uncondensible at temperatures and pressures within the container encountered during normal operation of the device. In fact, it was after he filed his 1956 application that plaintiff first realized that a device containing a condensible gas would not work. The claims of the 1956 application described a device containing either a gas or a liquid, or a combination of both, where the gamma of the gas, liquid or combination is not more than 1.25.[5] The indispensable teaching that the gas used in the device contemplated by plaintiff must be "uncondensible at temperatures and pressures within the container encountered during normal operation of the device," and why this is so, was first presented during the pendency of the 1960 application.

The accused device was described in printed publications in this country and was in public use and on sale in this country more than one year prior to the filing of the application on January 25, 1960. The January 19, 1959 issue of "Automotive News," page 50 of the October 27, 1958 issue of "Steel," and pages 62 and 174 of the October 1958 issue of "Motor Magazine" describe the accused shock absorber which was then in use on the 1959 Cadillac.

The plaintiff's patent concerns use of low gamma gases in pneumatic load bearing devices, such as vehicle tires and pneumatic springs in order that the devices may be "softer," i. e., that the devices may provide greater compliance, and the ride may be smoother.

The patent recites (Exh. 31, col. 2, lines 32–34): "The effect of such inflation (with a gas of a gamma of less than 1.25) has been tested in tires and found to be demonstrable in giving a noticeably smoother ride on rough surfaces . . . . " The plaintiff introduced no credible evidence to support this statement. To the contrary, plaintiff admitted at trial, and the Court finds, that the improvement in riding comfort attendant upon use of a low gamma gas as a tire inflatant is too small to justify its use; in fact, plaintiff realized by June 1957 that inflation of tires with a low gamma gas does not have any significant utility.

Although plaintiff maintains that theory indicates use of a low gamma gas in a shock absorber will provide greater compliance to jolts, he presented no credible evidence to show that the use of a low gamma gas in a shock absorber, or in the accused device in particular, results in a softer ride or provides any other benefit. The defendant, however, during early stages of development of the accused shock absorber, tested equal volumes of high and low gamma gases and no differences, apart from those relating to permeability, were discovered. The defendant also introduced evidence, through Mr. Owen, an expert on the application or use of the shock absorber in the automobile suspension, concerning ride evaluations he conducted. Mr. Owen evaluated the comfort obtainable

5. Claim 2 of the 1956 application states, however, that the gas' gamma must be "substantially less than 1.4." (Exh. J, p. 11.)

with conventional shock absorbers; he also evaluated that obtainable with the accused device. He was unable to discern any difference in comfort of ride between conventional shock absorbers and the accused device.[6] The Court credits the evidence presented by the defendant and described in this paragraph. Just as any improved riding comfort received from use of a low gamma gas as a tire inflatant is too small to justify its use, the theoretical differences between gases of different gammas and the benefits theoretically attendant upon use of a low gamma gas are not borne out in practical application. The use of a low gamma gas in a shock absorber does not produce a softer ride and does not result in any other advantage as to riding smoothness or comfort.

More than one year prior to the earliest patent application filed on January 9, 1956, it was a common, usual and customary practice to inflate vehicle tires with low gamma gas, specifically Freon-12 or propane, $C_3H_8$, and to operate the vehicle under conditions which maintained the gas in an uncondensed form during normal operation of the vehicle. The defendant asserts this practice is a prior public use which anticipated plaintiff's invention. The plaintiff argues that those inflating the tires with a low gamma gas did so without regard to the gamma of the gas, without realizing how to make a softer spring, and that no contribution to the art of pneumatic springs occurred. The plaintiff further argues that accidental results, not intended and not appreciated, do not constitute anticipation or prior art. Since the use of a low gamma gas in tires or shock absorbers has no utility in regard to riding softness, smoothness or comfort, plaintiff's invention produces no advantage with respect to the quality of the ride which the users of the low gamma gas could have intended or appreciated.

The plaintiff's witness, Professor Merrill, testified, and the Court finds, that Figure 3 of the patent, showing the tire inflated with a low gamma gas, see Appendix C, is described by claim 1 of the patent. Figure 3 is also described by claims 2 and 4.

A pneumatic vehicle tire, such as that depicted in Figure 3, is, at normal inflation pressure, a very active spring of high stiffness. Figure 3 is the only claimed embodiment of the invention which is illustrated in the patent; it differs radically from the schematic drawing of the accused device, compare Appendices A and C to this opinion.

Tires have long been inflated with common gases including air and carbon dioxide. The gamma of air is about 1.40; the gamma of carbon dioxide is about 1.28.

Claims 1, 2 and 4 of the patent specify that the device contemplated by plaintiff must include a gas with a gamma "of no more than about 1.25" (claim 1) or "of no more than 1.25" (claims 2, 4). There is, however, no criticality in the use of a gas with a gamma of 1.25 or less; the line of demarcation between low and high gamma gases is an arbitrary one. Plaintiff admitted this on the stand. The behavioral differences between gases of different gammas are a mere matter of degree, for example a gas with a gamma of 1.28 behaves substantially the same way as a gas with a gamma of 1.25. If, contrary to the fact herein found, it be assumed that the lower the gamma of the gas used in the device, the softer the resulting ride, then the claimed invention would be obvious to a person having ordinary skill in the art of the construction and inflation of pneumatic tires or other pneumatic springs or other pneumatic yieldable load bearing devices. As the patent examiner wrote on December 20, 1957, in the course of rejecting all nine claims

---

**6.** Freon-13, the low gamma gas used in the accused shock absorber, was not selected to provide a more comfortable ride; it was chosen because it will not permeate the ny-
lon bag which contains it. For findings concerning the selection of Freon-13 and purposes therefor, see pp. 242–243, *infra.*

of the 1956 application as amended on March 19, 1957:

"It is deemed that one skilled in the art would be aware of the fact that different compressible mediums in a spring would produce different spring rates whether these mediums be metallic coils, liquids, or gases. . . . From the foregoing, it is deemed that applicant has merely utilized the known properties of a known substance to arrive at a known result."

(Exh. 1, pp. 22–23.)

Defendant asserts that the patent is unenforceable because of plaintiff's or his patent attorney's "deceptive intent" in failing to disclose knowledge of the prior art German patent (Exh. AAA) to the Patent Office either during the pendency of plaintiff's 1956 patent application or during the pendency of his 1960 application. The Court has not been persuaded, and therefore does not find, that plaintiff or his patent attorney had any intent to deceive, or committed any inequitable conduct in the procurement of his patent.[7]

U. S. Patent No. 2,997,291 (Exh. 30) covers essentially the accused shock absorber and was issued on August 22, 1961 to Charles S. Stultz on an application filed February 18, 1959. The patent was assigned to the defendant, Stultz's employer.

The Stultz patent concerns the problem of aeration in shock absorbers. During stroking of the piston in a conventional shock absorber the

"pulsing flow of hydraulic fluid between the shock absorber cylinder and the reservoir causes a high degree of turbulance [sic] of the fluid in the reservoir with the result the hydraulic fluid picks up air in the reservoir and becomes aerated to such an extent as to cause disturbing lag in the liquid flow through the resistance valving at the instant of reversal of movement of the shock absorber piston."

(Exh. 30, col. 1, lines 49–56.) The defendant, therefore, extensively tested various materials to establish complete separation of the gas and the oil in the shock absorber. It was decided to separate the oil from the gas by enclosing the gas in a leak-proof bag.

The only criteria used to select the gas and the bag were (1) durability of the bag when subjected to normal operating conditions of the shock absorber; (2) whether and to what extent the gas would make its way through the walls of the bag and mix with and thereby aerate the oil; and (3) the inertness or compatibility of the gas and the bag. The specifications of the Stultz patent restate the second of these criteria in greater detail: an object of the patent is to prevent aeration "by forming a wall of the deformable gas chamber or cell of a . . . material that is impermeable to the hydraulic fluid in the shock absorber and to heavy molecular gases selected for retention in the gas chamber or cell . . . ." (Exh. 30, col. 2, lines 65–69.) Freon-13 enclosed in a nylon bag was the combination selected to prevent aeration. Freon-13 and the nylon are inert and durable substances. Freon-13 molecules are so large as compared to the molecules of the gases that make up the air, including nitrogen and carbon dioxide, that Freon-13 molecules do not permeate the nylon: "gases having a high molecular weight, such as 'Freon-13', are satisfactorily retained in a cell formed of nylon film." (Exh. 30, col. 7, lines 28–30.)

Stultz testified under oath at a deposition taken November 21, 1972 and introduced at trial. (Exh. 19.) At the deposition Stultz described the aeration problem, the methods which were attempted to prevent aeration and the testing of

7. Plaintiff's "Motion to Strike General Motors' Exhibits XX and YY and All Testimony Related to Those Exhibits" is moot; the material subject to that motion is unpersuasive, and the Court has not relied upon that material. No action, therefore, is appropriate on the motion.

various gases and substances for the gas' container.

The Court finds that the gamma of the gas had no bearing whatever on the selection of the gas. From the standpoint of shock absorber design and pressure buildup, the gamma of the gas makes a very insignificant difference or no difference at all. By ignoring the gamma of the gas the manufacturer does not incur any disadvantage. The only purpose for the use of Freon-13 enclosed in a nylon bag in a shock absorber is the prevention of aeration which causes loss of control.

The defendant's selection of Freon-13 was not derived in any way from any idea communicated by the plaintiff to anyone. It was arrived at independently of the plaintiff.

Each of the claims in issue describes a pneumatic yieldable load bearing device or a pneumatic spring effective to support a load. The "invention relates to pneumatic load bearing devices such as pneumatic tires and pneumatic springs which depend upon the pressure of a gas to provide a yielding support for a load." (Exh. 31, col. 1, lines 7–10.)

In his "Brief for Appellant," which concerned the 1956 application and was received by the Patent Office on April 30, 1959, the plaintiff informed the Board of Appeals:

"The invention here introduces a completely new concept to the construction of pneumatic springs. This can be appreciated by considering the two functions any spring performs, first it must support its load, and secondly it must protect the load from the effects of shocks, jolts and other types of sudden displacements. The softness of any spring is a measure of the motion it will permit under the application of some force; a softer spring is one which yields more when it is loaded. According to the standards of design previously known to the art, increased softness for protection against sudden displacements means also greater static deflection under static loading. Nowhere in the art is there any suggestion that softness to sudden displacement may be increased without also increasing a spring's softness to static loading.

"The present invention provides just such a spring by an expedient so basically simple that the only just conclusion is that it has been beyond the skill of the art.

"The need of a spring that is softer dynamically while retaining static stiffness or load bearing capacity is obvious, yet apparently the idea that static and dynamic softness run hand in hand has so blinded the art that it has never been realized that the use of certain gases other than air would provide the answer."

(Exh. 1, pp. 44–45.)

The specification of Patent No, 3,047,040, col. 1, lines 22–31 (Exh. 31), states (emphasis added):

"The invention is particularly useful in the springs in vehicular systems, as in passenger automobiles, where load support must be provided under widely varying rates of loading. *The springs must accordingly provide static support for the vehicle,* and must also respond under both low and high rates of loading varying from the slow compression accompanying the rolling on a turn or driving over a smoothly undulating roadway to the more rapid rates encountered in driving over bumpy roads, grade crossings, and the like."

Plaintiff's 1956 and 1960 applications and the patent disclose a device which must support a static load and which must also protect that load from sudden displacement. The device contemplated by plaintiff is one which must perform both of these functions. It is clear from reading the patent and the file wrapper of each application that the plaintiff intended his device to support a load consisting of the body and frame of a vehicle. The accused device, whether it is viewed as the shock absorber or merely the gas bag within the shock absorber,

is not designed to, and does not, support a static load; the accused device is not designed to, and does not, support any load whatsoever.

Automobile suspensions are examples of vibration control methods. Without properly designed suspension systems, shocks and vibrations caused by road irregularities would be transmitted directly from the wheel and axle assemblies to the chassis. Automobile suspension systems comprise two primary components—an elastic member consisting of a steel or pneumatic spring, and a shock absorber to damp out the motion of the elastic member. The primary function of the steel or pneumatic spring is to support the body and frame. The static load applied to the automobile suspension is supported solely by the steel or pneumatic springs which also are the sole support for dynamic loads applied to the suspension. The steel or pneumatic springs also dissipate energy and thereby restrict the magnitude of vibration. The shock absorbers, however, control the motion of an elastic suspension system by dampening the oscillation of the body, the frame and the steel or pneumatic springs. The spring elements of the suspension system are deformed by an impulse applied to them and tend to oscillate or vibrate after the impulse is applied. The shock absorbers retard the vibration and quickly restore equilibrium. Shock absorbers may be double acting in that they oppose both the compression of the springs and the rebound. The movement of the piston within the shock absorber pushes fluid through small orifices in the top of the piston, and results in substantial resistance to the movement of the piston and the fluid as the fluid flows from one compartment to another within the shock absorber. This controlled resistance limits the rate of vibration of the body, the frame, and the springs.

The accused device is neither the pneumatic load bearing device covered by claims 1 and 2, nor the "pneumatic spring . . . effective . . . to support a load" covered by claim 4. The accused device is not intended, or designed, or constructed to support the body and frame of the vehicle. The body and frame, sometimes referred to as the sprung mass, of the vehicle are in fact supported by steel or pneumatic springs. They are not supported by the accused shock absorbers. The accused device is incapable of supporting the sprung mass. These facts are established by the testimony of the defendant's expert witnesses and confirmed by an experiment set up and carried out with exacting care by the defendant's experts in the presence of the Court.

### Conclusions of Law [8]

This Court has jurisdiction.

U. S. Patent No. 3,047,040 cannot receive the benefit of the January 9, 1956

---

8. These are the applicable statutes:

35 U.S.C.A. § 282: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

35 U.S.C.A. § 101: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

35 U.S.C.A. § 102(b): "A person shall be entitled to a patent unless—

\*      \*      \*      \*      \*

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

35 U.S.C.A. § 103: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

35 U.S.C.A. § 120: "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the

filing date because the earlier application does not include, either expressly or by reasonable inference or implication the crucial limitation that the low gamma gas used in the patented device must be uncondensible during normal operation of the device. 35 U.S.C. § 120.

Claims 1, 2 and 4 of U. S. Patent No. 3,047,040 are invalid under 35 U.S.C. § 102(b) because the accused device, assuming it infringes, was described in printed publications and was in public use and on sale in this country more than one year prior to January 25, 1960, the earliest filing date to which the claims of the patent could be entitled.

Plaintiff seeks to monopolize the purported benefits which flow from a natural physical property of gases. He asserts that the compressibility of a gas varies according to the gamma of the gas and that the lower the gamma of a gas, the more compressible it is. (Exh. 31.) Plaintiff in effect seeks to monopolize the use of gases which have a gamma below 1.25, which he considers to be the most compressible, whenever such gases are used in any pneumatic load bearing device or pneumatic spring. Plaintiff's claims are so broad as to constitute an attempt to patent compressibility, a natural property of gases. Claims 1, 2 and 4 are invalid under 35 U.S.C. § 101 because they are too broad and cover too much ground. O'Reilly v. Morse, 56 U.S. 62, 15 How. 62, 14 L.Ed. 601 (1853); The Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863 (1888).

The claims are also invalid for want of patentable invention since they do not disclose "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101; U.S. Const. art. 1, § 8, cl. 8.

The claims also fail for another reason to disclose a patentable invention under section 101, since

"A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of the arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible. A claim must be based on invention. The claim to invention depends here upon an alleged discovery of certain limits or points which do not exist in fact and there is therefore no invention."

Kwik Set, Inc. v. Welch Grape Juice Co., 86 F.2d 945, 947 (2 Cir. 1936).

The differences between the subject matter of claims 1, 2 and 4 and the prior art are such that the subject matter as a whole would have been obvious at the time the claimed invention was made to a person having ordinary skill in the art of constructing and inflating pneumatic springs or other pneumatic yieldable load bearing devices. Claims 1, 2 and 4 are therefore invalid under 35 U.S.C. § 103. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

The Court further holds that claims 1, 2 and 4 of the patent, if valid, have not been infringed by the accused device.

In the case of the plaintiff against the defendant, it is *ordered* that judgment be entered for the defendant.

With respect to the defendant's counterclaim, it is *ordered* that judgment be entered for the defendant under the pro-

same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application

or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

**246**

visions of 28 U.S.C. § 2201, declaring (a) that claims 1, 2 and 4 of U. S. Patent No. 3,047,040 are not infringed; and (b) that claims, 1, 2 and 4 of U. S. Patent No. 3, 047,040 are invalid.

It is *further ordered* that the plaintiff be and he hereby is permanently enjoined from asserting any further claim of infringement and from bringing any further suit based upon claims 1, 2 and 4 of U. S. Patent No. 3,047,040 against the defendant or anyone in privity with the defendant, including defendant's customers and prospective customers.

APPENDIX A

557985

Fig. 1

INVENTOR.
THOMAS A O CROSS
BY
ATTORNEYS

APPENDIX B

July 31, 1962          T. A. O. GROSS          3,047,040

PNEUMATIC LOAD BEARING DEVICES

Filed Jan. 25, 1960                    2 Sheets-Sheet 2

FIG. 3

LOW GAMMA GAS, e.g.,

| | |
|---|---|
| $CCIF_3$ | $SF_6$ |
| $CH_3F$ | $BF_3$ |
| $CF_4$ | $CBrF_3$ |
| $C_2F_6$ | $CCl_2F_2$ |
| $CHF_3$ | |

INVENTOR.
THOMAS A. O. GROSS
BY
*Kinney, Jenney & Hildreth*

ATTORNEYS

APPENDIX C